260

SHAPIRO, BERNSTEIN & CO., Inc., Gershwin Publishing Corporation, Edward B. Marks Music Corporation, Miller Music Corporation, Lewis Music Publishing Company, Inc., and Mutual Music Society, Inc., Plaintiffs-Appellants,

Helen D. Miller, Individually and as Executrix of the Estate of Alton G. Miller, Deceased, Plaintiff,

v.

Sam GOODY and Portem Distributing, Inc., Defendants-Appellees,

Sidney Turk and Harold Grossbardt, individually and doing business as Colony Record & Radio Center, Colony Record & Radio Center, Inc., Arcade Music Shop, Inc., Rivoli Music Center, Inc., and Joseph Krug, individually and doing business as A. F. N. Record Co., Defendants.

No. 238, Docket 24392.

United States Court of Appeals Second Circuit.

Argued Feb. 13, 1957.

Decided Sept. 28, 1957.

Julian T. Abeles (of Abeles & Bernstein), New York City, for plaintiffs-appellants.

A. M. Lowenthal (of Telsey & Lowenthal), New York City (Leon G. Telsey, New York City, on the brief), for defendant-appellee, Sam Goody.

Before HINCKS, LUMBARD and WATERMAN, Circuit Judges.

HINCKS, Circuit Judge.

The plaintiffs-appellants, music publishers, and the defendants-appellees, Goody and Portem Distributing, Inc., moved for summary judgment on the following facts.

Joseph Krug, an original defendant below, manufactured two long-play phonograph disks on which were recorded propaganda radio broadcasts made by Major Alton "Glenn" Miller and his orchestra during the Second World War. These records included nine copyrighted musical selections the copyrights to which were owned by the six publisher-appellants each of whom had previously authorized its said copyrighted selections to be recorded. However, Krug had not been licensed to make the recordings involved, nor had he filed the notices nor paid the statutory royalties required by 17 U.S.C.A. §§ 1(e) and 101(e).

The records were labeled "Major Glenn Miller and His A.E.F. Orchestra," "An A.F.N. Presentation." The same legends were on the jackets which also bore a photograph of Miller in uniform. On both disk and jacket the customary disclosure of the manufacturer was absent except for the cryptic reference to "A. F.N." Krug, who made the records by tape recording off-the-air radio broadcasts, was thus spared the expense to which "legitimate" record producers are put for the talent of musical performers and the skill of recording technicians. Such practice is known to the trade as

"disklegging," "bootlegging" or record "piracy."

Krug sold these records to dealer customers including the defendants, Sam Goody and Portem Distributing, Inc., who, in turn, sold them to the public at a considerably lower price than those produced by the Radio Corporation of America to whom the Millers, in so far as they had power to do so, had given exclusive rights to make and sell records of the performance involved.

It is a curious fact that although the Copyright Law has remained without relevant change since 1909 this case should present a question both basic and novel. Does either the Copyright Act or the common law provide copyright owners with a remedy against non-manufacturing sellers of unauthorized phonograph recordings of copyrighted songs?

On this appeal, we are concerned only with the rights of copyright owners. The plaintiff, Helen D. Miller, suing for the estate of her husband, is not a party to this appeal and her claims are not before us. Nor is the defendant Joseph Krug a party to the appeal because the appellants after obtaining a default judgment against him, Miller v. Goody, D.C., 125 F.Supp. 348, agreed to a dismissal, with prejudice, as to the action against him upon the payment to them of $2,000 which, the appellants claim, was compensation for some of the expenses of the suit. In releasing Krug the appellants reserved all rights against the other defendants, including the appellees.

In 1908 the Supreme Court held that player piano rolls were not "copies" and hence did not infringe musical copyrights. White-Smith Music Publishing Co. v. Apollo Co., 209 U.S. 1, 28 S.Ct. 319, 52 L.Ed. 655. The rationale of the opinion clearly included phonograph records within that group of mechanical reproductions which were not deemed to be copies for purposes of the then existing Copyright Act. Partially in response to that decision, the House Committee on Patents of the 60th Congress reported out a bill, which was later enacted and is now the law, carefully limiting the effect of the White-Smith decision. But by the very structure of the new law the case was not "overruled," as is best shown by the words of the Committee itself, *viz.*:

"Your committee have felt that justice and fair dealing, however, required that when the copyrighted music of a composer was appropriated for mechanical reproduction the composer should have some compensation for its use and that the composer should have the further right of forbidding, if he so desired, the rendition of his copyrighted music by the mechanical reproducers. How to protect him in these rights without establishing a 'great music monopoly was the practical question the committee had to deal with. The only way to effect both purposes, as it seemed to the committee, was, after giving the composer the exclusive right to prohibit the use of his music by the mechanical reproducers, to provide that if he used or permitted the use of his music for such purpose then, upon the payment of a reasonable royalty, all who desired might reproduce the music." House Rep. No. 2222 on H. R. 28192, 60th Cong. 2d Sess., p. 6.

The provisions necessary to implement the legislative scheme were incorporated into the 1909 Act and have remained unchanged to the present time. We set them forth in the margin.[1] Section 1(e),

---

1. "§ 1. *Exclusive rights as to copyrighted works*

&ast; &ast; &ast; &ast; &ast;

"(e) To perform the copyrighted work publicly for profit if it be a musical composition; and for the purpose of public performance for profit, and for the purposes set forth in subsection (a) hereof, to make any arrangement or setting of it or of the melody of it in any system of notation or any form of record in which the thought of an author may be recorded and from which it may be read or reproduced: *Provided*, That the provisions of this title, so far as they secure copyright controlling the parts

by its terms, concerns the compulsory licensing of the "manufacturer" of mechanical reproductions of the copyrighted work, and provides that if the 2¢ per "part" royalty is not paid by the manufacturer, the court in its discretion may award as damages to each owner whose copyright is infringed by the record ("part") the 2¢ royalty due plus three times that amount.

Section 101(e) provides that whenever the copyright owner has permitted of instruments serving to reproduce mechanically the musical work, shall include only compositions published and copyrighted after July 1, 1909, and shall not include the works of a foreign author or composer unless the foreign state or nation of which such author or composer is a citizen or subject grants, either by treaty, convention, agreement, or law, to citizens of the United States similar rights. And as a condition of extending the copyright control to such mechanical reproductions, that whenever the owner of a musical copyright has used or permitted or knowingly acquiesced in the use of the copyrighted work upon the parts of instruments serving to reproduce mechanically the musical work, any other person may make similar use of the copyrighted work upon the payment to the copyright proprietor of a royalty of 2 cents on each such part manufactured, to be paid by the manufacturer thereof; and the copyright proprietor may require, and if so the manufacturer shall furnish, a report under oath on the 20th day of each month on the number of parts of instruments manufactured during the previous month serving to reproduce mechanically said musical work, and royalties shall be due on the parts manufactured during any month upon the 20th of the next succeeding month. The payment of the royalty provided for by this section shall free the articles or devices for which such royalty has been paid from further contribution to the copyright except in case of public performance for profit. It shall be the duty of the copyright owner, if he uses the musical composition himself for the manufacture of parts of instruments serving to reproduce mechanically the musical work, or licenses others to do so, to file notice thereof, accompanied by a recording fee, in the copyright office, and any failure to file such notice shall be a complete defense to any suit, action, or proceeding for any infringement of such copyright.

"In case of failure of such manufacturer to pay to the copyright proprietor within thirty days after demand in writing the full sum of royalties due at said rate at the date of such demand, the court may award taxable costs to the plaintiff and a reasonable counsel fee, and the court may, in its discretion, enter judgment therein for any sum in addition over the amount found to be due as royalty in accordance with the terms of this title, not exceeding three times such amount.

"The reproduction or rendition of a musical composition by or upon coin-operated machines shall not be deemed a public performance for profit unless a fee is charged for admission to the place where such reproduction or rendition occurs."

"§ 101. *Infringment*

    \*       \*      \*      \*      \*

"(e) *Royalties for use of mechanical reproduction of musical works.*—Whenever the owner of a musical copyright has used or permitted the use of the copyrighted work upon the parts of musical instruments serving to reproduce mechanically the musical work, then in case of infringement of such copyright by the unauthorized manufacture, use, or sale of interchangeable parts, such as disks, rolls, bands, or cylinders for use in mechanical music-producing machines adapted to reproduce the copyrighted music, no criminal action shall be brought, but in a civil action an injunction may be granted upon such terms as the court may impose, and the plaintiff shall be entitled to recover in lieu of profits and damages a royalty as provided in section 1, subsection (e), of this title: *Provided also*, That whenever any person, in the absence of a license agreement, intends to use a copyrighted musical composition upon the parts of instruments serving to reproduce mechanically the musical work, relying upon the compulsory license provision of this title, he shall serve notice of such intention, by registered mail, upon the copyright proprietor at his last address disclosed by the records of the copyright office, sending to the copyright office a duplicate of such notice; and in case of his failure so to do the court may, in his discretion, in addition to sums hereinabove mentioned, award the complainant a further sum, not to exceed three times the amount provided by section 1, subsection (e), of this title, by way of damages, and not as a penalty, and also a temporary injunction until the full award is paid."

the making of one mechanical reproduction the unauthorized "manufacture, use, or sale" of a record (mechanical reproduction) constitutes an infringement and entitles the owner to an injunction and a recovery, in lieu of profits and damages, of the royalty provided in § 1(e). It also directs "any person" who, in the absence of a license agreement, intends to use the copyrighted music, once it has been licensed to another, to serve notice to that effect on the copyright owner thereof and the copyright office. It further provides that, upon failure to comply with the compulsory licensing provision, the court in its discretion may award the owner "a further sum, not to exceed three times the amount provided by section 1, subsection (e), of this title, by way of damages * * *."

A natural reading of these sections leads us to the conclusion that a seller of unauthorized records of copyrighted music, although having no connection with the manufacturer, is an infringer and liable for damages which the Act provides. But the appellees urge us to eliminate from the phrase "manufacture, use, or sale of interchangeable parts, such as disks * * *" (§ 101(e)) the word "sale." Failure to do so, they contend, would create conflict with what the appellees claim is the basic purpose of the entire compulsory licensing scheme. To substantiate this, the appellees point to certain alleged injustices which would result from such interpretation.

First, appellees claim that such construction would hinge their liability as non-manufacturing sellers on the acts or omissions of the manufacturer, over whom they have no control. Even if this be true, it is no more burdensome than the liability of any non-manufacturing seller who, without knowing it, infringes a copyright. Such sellers generally have no more control over their supplier's compliance with the Act than these appellees, yet are held liable. F. W. Woolworth Co. v. Contemporary Art, 344 U.S. 228, 229, 73 S.Ct. 222, 97 L.Ed. 276. Cf. 35 U.S.C.A. § 271(a). That records

are not "copies," will not save the record bootlegger from the rule of the Woolworth case because § 101(e) clearly classifies the sale of unauthorized records as an infringement.

Also, the appellees urge that in their case it would be unjust to burden them with the impractical responsibility of ascertaining at their peril whether records they sell have been authorized by the Copyright Act or by the owners of all copyrighted music thereon, especially in view of the fact that other authorized recordings (since not "copies") do not carry a compulsory copyright notation. But this burden, we think, it not unduly onerous; most reputable manufacturers can easily demonstrate to their customers that their records are authorized. When dealing with unknown manufacturers the burden on a purchaser for resale to exercise caution is no greater than that required of the buyer of any merchandise which might infringe. Cf. F. W. Woolworth Co. v. Contemporary Art, supra. Since, as will be shown, the dollar liability for selling unauthorized records is usually less (because of the generally small value) than that imposed upon other non-manufacturing infringers, 17 U.S.C.A. § 101(b), we cannot say that the burden of diligence is so great as to overcome what we would otherwise conclude is the statutory scheme.

The appellees further urge that it would be anomalous to hold the seller liable, when the manufacturer, according to the doctrine of G. Ricordi & Co. v. Columbia Graphophone Co., 2 Cir., 263 F. 354, may at any time, even after judgment, file for a compulsory license and free the subject records from their infringing status. This argument misconceives the holding of the Ricordi case. As we understand that case, there were two sets of records, one voice, the other violin, both manufactured by the defendant therein and both using the same copyrighted music. The voice records were originally the subject of the suit and we held that the defendant, notwithstanding his obtaining during the course of the suit a license for violin rec-

ords, which he seemingly had not manufactured before suit, was liable for statutory damages for the voice records. We held that the subsequent violin license estopped the defendant from attacking the basic validity of the copyright in issue, but this was all we held. And this aside, there is nothing anomalous in a statutory provision for a claim for the 2¢ royalty against a seller who at the time of his sale was an infringer. To declare that a royalty payment frees the record from further contribution (§ 1(e)) is a far cry from saying that the payment exonerates any and all prior infringers from liability already accrued.

The appellees point to our decision in Shilkret v. Musicraft Records, 2 Cir., 131 F.2d 929, as an instance where we did not give some words of the Copyright Act their literal interpretation. In that case, a strict construction would have created an obvious conflict in the statute. Here, there is no such conflict: our interpretation accords significance and effect to all the words of the statute. Ex parte Public Nat. Bank, 278 U.S. 101, 104, 49 S.Ct. 43, 73 L.Ed. 202. We hold that the appellees, as sellers of unauthorized records, are liable under § 101(e).

■ There is no room for arguing that even if § 101(e) does apply to sellers and makes them liable for infringement there is no penalty prescribed,—only injunctive relief is provided. Under this argument the phrase allowing plaintiff to recover a "royalty as provided in section 1, subsection (e)" is limited to manufacturer defendants since they are the only defendants referred to in § 1(e). But this approach overlooks the fact that the manufacturer-defendants under § 1(e) (authorized manufacturers) can never be the same persons as the manufacturer-defendants (unauthorized manufacturers) under § 101(e). Since it is plain that the remedy of § 101(e) extends to unauthorized manufacturers who could not be sued under § 1(e), we think it equally apparent that the reference in § 101(e) to the "royalty as provided in" § 1(e) was intended to limit not the class of potential defendants but only

the amount of the royalty. This view is supported by the declaration in § 101 (e) that "the plaintiff shall be entitled to recover" rather than that "the defendant shall be liable." It is further supported by the fact that the phrase appears in the part of § 101(e) concerned with measure of recovery and not with liability.

■ We next come to the appellants' contention that they each may have a recovery under § 101(e) which in no event may be less than the $250 minimum per infringement provided in § 101(b). We conclude, as did Judge Kaufman, that under the statutory scheme the general damage provisions of § 101(b) are not applicable to the infringement of a musical copyright by mechanical reproduction.

Section 101(b) indicates that the measure of recovery is all the damage suffered by the owner plus all profits of the infringer. However, in lieu of proof of "actual damages and profits," because of the difficulty of proof, Brady v. Daly, 175 U.S. 148, 157, 20 S.Ct. 62, 44 L.Ed. 109, the court may award damages as may appear just between general limits, viz., a minimum of $250 and a maximum of $5,000. The specific limits set in § 101(b) for the types of infringement listed in the four subsections are merely guideposts for the courts to employ between the general limits. Jewell-LaSalle Realty Co. v. Buck, 283 U.S. 202, 51 S.Ct. 407, 75 L.Ed. 978; L. A. Westerman Co. v. Dispatch Printing Co., 249 U.S. 100, 39 S.Ct. 194, 63 L.Ed. 499.

But when the Copyright Act of 1909 extended copyright control to the reproduction of music by mechanical parts a different regulatory plan was adopted and a different basis of recovery was provided which, we think, is in essential conflict with the measure of recovery under § 101(b). For the royalty under the compulsory license provided by § 1 (e), which Congress set arbitrarily at 2¢ per record, was a form of statutory compensation which by its very nature measured the damages resulting from its non-payment. That this was so is in-

dicated by the wording of § 101(e) which provided for the recovery of the royalty "in lieu of profits and damages." Since, under the statutory scheme, recovery of the statutory royalty afforded the measure of compensation which Congress contemplated for the owner, the difficult problem of proof which is presented in cases not controlled by a royalty does not arise and there is hence no need in such cases for the application of the $5,000 maximum and a $250 minimum which Congress provided for other types of infringement under § 101 (b) as a substitute for proof of actual damages. For cases under § 101(e), the basic royalty of 2¢ is both maximum and minimum: as to this basic amount there is no discretion. In view of this conflict between the scheme envisaged by § 101(b) and that of § 101 (e), we think the specific statutory sections concerned with parts serving to reproduce mechanically the musical work, which are also textually and chronologically later than § 101(b), should control the general provisions. Townsend v. Little, 109 U.S. 504, 3 S.Ct. 357, 27 L.Ed. 1012; United States v. City of Chester, 3 Cir., 144 F.2d 415; United States v. Windle, 8 Cir., 158 F.2d 196.

▪ This brings us to another troublesome question which also is novel: Does the owner's recovery against the seller, like his recovery against the manufacturer, include in addition to the 2¢ royalty a discretionary allowance not to exceed the royalty trebled, or is it limited to the 2¢ royalty?

As to this, we hold that the recovery against a seller is limited to 2¢ per record. Certainly in the first part of § 101(e), which casts liability for infringement upon sellers, there is no provision for the addition to the award of a sum comprising the royalty trebled: the provision therein contained for allowance against a seller of "a royalty as provided in section 1, subsection (e)" points solely to that part of § 1(e) which creates a statutory royalty of 2¢, not to the next to the last paragraph in § 1(e) which gives the court discretion

to increase the award by the royalty trebled. The language providing for a recovery against the seller of "a royalty" is scarcely adequate to provide a recovery of a sum amounting to the royalty plus the royalty trebled. Moreover, the proviso which comprises the second part of § 101(e) is limited to a person who, "in the absence of a license agreement, *intends to use* a copyrighted musical composition upon parts of instruments * * *, relying upon the compulsory license provision of this title." The language of this limitation is apt for application to a manufacturer,— but scarcely applicable to a dealer who generally does not *intend to use a composition upon the parts of instruments* etc. Indeed, if the enlarged recovery created by the proviso was intended, like the remedy provided in the first part of § 101(e), to apply to sellers as well as manufacturers, the limitation of the proviso, quoted above, would have been entirely redundant.

▪ There is also a certain amount of ambiguity as to the effect of § 116 of Title 17 on § 101(e). Section 116 of Title 17 declares that in "all" actions under that title "full costs" shall be allowed and the prevailing party, in the discretion of the court, may be awarded reasonable attorney's fees. Although this general provision has no exceptive clauses, § 1(e) contains a specific provision making both "taxable costs" and counsel fees discretionary when the plaintiff copyright owner prevails. Section 101(e) is silent as to both factors and there is no reason to read § 101(e) as limited by § 1(e) since we have shown that these two sections are directed at two different situations. We believe that the general provisions of § 116 are applicable to cases under § 101(e) so that "full costs" are to be allowed and the prevailing parties will be entitled to reasonable fees in the discretion of the District Court.

▪ The appellees would avoid any recovery by the appellants under § 101 (e) because the appellants have settled with Krug. This, they claim, freed the

records involved in this action from further contribution to the copyright proprietors. The settlement thus invoked was made pursuant to a stipulation of the parties after the pending action had been brought and after the defendant Krug, who had suffered a default judgment for failure to answer the complaint, had filed a counterclaim against the plaintiff Helen D. Miller, individually and as executrix. By the stipulation it was provided that Krug would discontinue his counterclaim against the said Miller and would pay the plaintiffs $2,000 "on account of the costs and expenses incurred by the plaintiffs, other than Helen D. Miller individually et cetera, in their proceedings herein against said defendant" and that the plaintiffs would "release and forever discharge * * * Krug * * * from all rights, claims, demands * * * concerning the subject matter of the above entitled action * * *; without prejudice to any and all rights, claims, demands * * * of the * * * plaintiffs * * * against the defendants * * * other than * * * Krug * * *; the above named plaintiffs * * * expressly excepting and reserving, and not hereby intending to settle * * * any rights, claims, demands * * * which they * * * may or can have against Krug * * * and any and all others * * *." The court below, after reading this stipulation, entered the order of discontinuance therein provided for and the settlement was consummated.

To assess the impact of this settlement on the situation presented here, it is necessary first to determine whether the liability of the defendant-infringers under the Copyright Act is to any extent joint. We think not: we hold that the liability of each infringer, whether he be manufacturer, distributor or retailer, is several. For § 101(e) clearly defines infringement in the alternative, viz., "unauthorized manufacture, use, or sale". From a normal reading of these words it would appear that the unauthorized manufacture of a set of "parts" or records is an infringement of each copyright and that unauthorized sale of some or all of that set is a separate infringement. L. A. Westerman Co. v. Dispatch Printing Co., supra. This would mean that the manufacturer and the seller are each liable as infringers. The appellees argue that both the manufacturer and the seller may not be held liable because § 1(e) expressly provides that a 2¢ royalty payment will free the record from further contribution. But, as we have said earlier, this 2¢ payment, while freeing the record, does not automatically terminate the liability of prior infringers. Since the liability of each defendant for royalties is several and independent, it follows that the appellees may not claim that any part of Krug's payment of $2,000 reduces their liability for royalties.

■ However, the settlement with Krug is a factor to consider in the assessment of costs which, we have seen, are mandatory for the prevailing party. Since the appellants have chosen to proceed against Krug and numerous other alleged infringers in this one action, any money Krug paid which was fairly allocable to the costs of this action should be allowed as a set-off against the liability, if any, of the other defendants for costs.

Similarly, when the question of plaintiffs' counsel fees is presented, if the District Court should decide to exercise its discretion and award fees, after fixing the amount to be allowed it should take into consideration the amount already paid by Krug which is fairly allocable to such fees and reduce the remaining liability, if any, of the other defendants by that amount.

■ The appellants, in addition to their statutory action, alleged a common law claim for "unfair trade practices and unfair competition" which was dismissed because the music in issue, having been published, was protected only by the Copyright Law, which afforded the sole measure of protection. The appellants claim that, notwithstanding publication of the songs, they retain common law rights in the titles and may on that ac-

count prevent the appellees' use thereof. There is no claim here that Krug or the appellees meant to, or that their labeling did in fact, mislead the public as to the musical content of the records. If the appellants' titles were used, it was because their songs were used. Absent the Copyright Law, this would be proper. National Comics Publications v. Fawcett Publications, 2 Cir., 191 F.2d 594. Titles are protected only to the extent necessary to prevent confusion on the part of the public as to the indentity of the composition covered by the title. Warner Bros. Pictures, Inc. v. Majestic Pictures Corp., 2 Cir., 70 F.2d 310, 312. Where, as here, there is no confusion and no deception, protection is denied. Becker v. Loews, Inc., 7 Cir., 133 F.2d 889, 893, certiorari denied 319 U.S. 772, 63 S.Ct. 1438, 87 L.Ed. 1720; Manners v. Triangle Film Corp., 2 Cir., 247 F. 301, 303; International Film Service Co. v. Associated Producers, D.C.S.D.N.Y., 273 F. 585, 587.

Appellants urge that the District Judge dismissed this common law count without passing on the merits. That this contention is demonstrably false may be seen from the District Court's opinion. 139 F.Supp. at page 187. The disposition below of this common law claim was on the merits and was correct.

It certainly is true that the Act of 1909 in its provisions extending copyright control of musical compositions and mechanical parts is in several respects difficult to interpret. However, we think the foregoing rulings and interpretations are fairly indicated by the text of the Act and the structure of the statutory scheme. As Judge Kaufman so well said below, it is only for Congress to decide whether the protection and control afforded the proprietor is "fair," or "adequate" either from the private or the public viewpoint, or is the best possible balance between private and public interests.

The upshot of our rulings requires that the summary judgment in favor of these appellees be reversed. On remand, it will be for the court to determine in accordance with the foregoing opinion whether each defendant infringed and, if so, to enter an appropriate judgment against each such defendant which shall reflect such determinations as shall be made with respect to costs and counsel fees.

Reversed and remanded.